IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 24, 2005 Session

**IN RE M.J.H.**

**MAL HOOKER v. TONIA SMITH JOHNSON**

**An Appeal from the Juvenile Court for Shelby County**
**No. F2227      Robert W. Newell, Judge**

---

**No. W2004-02865-COA-R3-CV - Filed December 15, 2005**

---

This is a petition in juvenile court to modify custody. In November 1997, the juvenile court issued an order granting the mother primary residential custody of the parties' daughter, and granting the father liberal visitation. In October 2001, the father filed a petition to modify his visitation. The father's petition was later amended to add a request for joint custody. In November 2001, the juvenile court entered an order rescheduling the matter for a later date and granting the father visitation with the child for a full week on alternating weeks, pending the hearing. The mother tried to obtain a rehearing of that order, but was unable to do so because of numerous procedural problems. In July 2004, a final hearing was conducted. The juvenile court determined that no material change in circumstances had occurred since the November 1997 order, and that the child's best interest would not be served by granting the parties joint custody. The juvenile court slightly modified the visitation schedule for the father set forth in the November 1997 order. From that order, the father now appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

William T. Winchester, Memphis, Tennessee, for the appellant, Mal Hooker.

Gregory S. Gallagher, Memphis, Tennessee, for the appellee, Tonia Smith Johnson.

**OPINION**

This is a procedurally convoluted child custody case. Petitioner/Appellant Mal Hooker ("Father") and Respondent/Appellee Tonia Johnson ("Mother") are the natural parents of Malondria Jenise Hooker ("Malondria" or "the child"), born April 29, 1994. Father and Mother were never

married to each other. On May 20, 1994, pursuant to a paternity petition, Father was found to be the child's natural father. Malondria lived with Mother, and Father had visitation with her.

On March 21, 1996, Father filed a petition for custody of Malondria. On September 4, 1996, the Juvenile Court Referee ("Referee") recommended that Mother be designated the primary residential parent, with liberal visitation for Father. The Juvenile Court Judge approved the recommendation. Father filed a timely request for a rehearing before the Juvenile Court. On November 12, 1997, after a hearing, the Juvenile Court entered an order giving Father more liberal visitation, but retaining Mother as the primary residential parent.

On April 7, 1998, Father filed a petition to modify his visitation. On May 7, 1998, the Juvenile Court slightly modified Father's visitation with respect to the place of pick up and return of the child.

On December 18, 1998, Mother filed a petition to modify Father's visitation. On January 9, 1999, the Juvenile Court denied her petition.

On October 5, 2001, Father filed another petition to modify his visitation. On November 5, 2001, Father filed an amended petition adding a request for joint custody, but with Mother remaining the primary residential parent.

On November 15, 2001, Juvenile Court Referee Cary Woods conducted a hearing. No evidence was taken at the hearing; there was only oral argument between Father's attorney and Mother, who was unrepresented by counsel. Juvenile Court Referee Woods thereafter recommended that the case be continued until April 4, 2002. In addition, however, Referee Woods recommended a significant change in the parties' custody arrangement, allowing Father to have residential parenting time with Malondria for a full week on alternating weeks "pending further orders of this Court." The Juvenile Court Judge confirmed the Referee's recommendation.

On December 14, 2001, Mother filed a petition for rehearing of the November 15, 2001 decision, arguing that no proof was submitted at the hearing, and that there was no justification for what was essentially a temporary change in custody. Mother acknowledged that her petition for rehearing was untimely filed, outside the five-day time limitation for filing such petitions,[1] but claimed that she had "good cause" for filing her petition after the five-day limit. Mother explained that, immediately after the November 15, 2001 hearing, she went to the Juvenile Court Clerk's office to request a rehearing. When she did so, she said, she was told that she could not obtain a rehearing because the judgment was not final and would not be final until April 2002. Thereafter, Mother said, she attempted to contact an attorney, who told her that the only way she could appeal the Juvenile Court's ruling was if there was an emergency situation. Subsequently, Mother retained the services of Gregory Gallagher, her attorney of record in this appeal. Still, the Juvenile Court did not rule on

---

[1]According to Local Rule 13 for the Shelby County Juvenile Court, a party may file a request for a hearing before the presiding judge "within five (5) days after the date of the hearing before the Referee."

Mother's petition to rehear, and nothing further happened in the case until the date of the scheduled April 2002 hearing.

On April 4, 2002, prior to the hearing, Mother filed a motion for "Recusal of Juvenile Court and Transfer of Cause to Circuit Court." Noting that Father was employed by Juvenile Court, Mother's motion alleged that Father had insinuated that he had received special treatment by the Juvenile Court in this matter because of his employment. Because of this, Mother asked that the matter by transferred to the Circuit Court. On June 27, 2002, Referee Woods recommended (a) that Mother's December 14, 2002 petition for rehearing be dismissed; (b) that the November 15, 2001 order remain in effect; and (c) that the case be transferred to the Circuit Court for adjudication. The Juvenile Court Judge approved the Referee's recommendation. Father sought a rehearing to challenge the June 27, 2002 order, but his request was denied on September 5, 2002.

On November 7, 2002, Mother filed a Rule 60 motion for relief from the June 27, 2002 order, seeking to include language in the order that Father's petition for modification of custody, and Mother's challenge to his petition, remained an open issue. On December 10, 2002, the Juvenile Court Referee denied Mother's Rule 60 motion. On December 18, 2002, Mother filed a notice of appeal of this ruling to Circuit Court.

During the next year, proceedings were held in Circuit Court. Initially, in June 2003, the Circuit Court granted Mother's motion to dismiss Father's petition for joint custody, as amended, and set aside the Juvenile Court's November 15, 2001 order. On December 15, 2003, however, the Circuit Court vacated its June 2003 order, dismissed the case for lack of subject matter jurisdiction, and remanded the case back to the Juvenile Court "in the same posture as it was received by this Court." The matter was then set for a hearing in the Juvenile Court on April 8, 2004.

A hearing was conducted as scheduled on April 8, 2004, before Juvenile Court Referee Woods. After the hearing, Referee Woods held that the Juvenile Court order entered by him on November 15, 2001 was only temporary in nature, and that the parties were entitled to a full hearing. The matter was set for a full hearing on June 15, 2004.

On May 10, 2004, prior to the scheduled hearing, Father filed a motion entitled "Motion for Recusal and Appointment of out of County Judge by Interchange," purporting to join Mother's April 2002 motion for recusal. Father noted that Mother worked for the citizen's dispute center at the General Sessions Justice Center, and her new husband, Victor Johnson ("Stepfather"), worked for the General Sessions Court. Father asserted that Mother and Stepfather used their connections in General Sessions Court to make false complaints against Father that were mediated by the dispute center where Mother worked.[2] Mother filed a response in which she concurred in Father's motion for recusal, but alleged that Father's motion was filed only to prolong and delay the proceedings.

---

[2]Father also cited the fact that the brother of Mother's attorney is a child support attorney for the Tennessee Department of Human Services, whose office is located in the Juvenile Court and is a former General Session's Court judge. It is unclear how Father believed this fact to be pertinent.

Both parties' requests for recusal were granted on May 26, 2004. On July 2, 2004, an order was entered appointing Gibson County Juvenile Court Judge Robert Newell to hear the case.

Father then filed a "Motion to Determine Issues Before the Court" and a supporting memorandum. In his motion, Father argued that nothing pending before the court at that time required a hearing. Mother filed a response to the contrary, asserting that, as determined by the Juvenile Court at the April 8, 2004 hearing, the November 15, 2001 order was temporary in nature and a full hearing was necessary to resolve Father's original petition and amended petition for joint custody.

On August 12, 2004, Juvenile Court Judge Newell entered an order providing that (a) all orders pertaining to child support and visitation up to November 15, 2001 came into effect when the case was transferred to Juvenile Court from Circuit Court; (b) the parties had a right to a pre-hearing to challenge the November 15, 2001 issue; (c) Mother's December 14, 2001 petition for rehearing was granted and the court would reconsider the November 15, 2001 order; (d) that the parties were ordered to file amended and updated petitions before October 6, 2004.

On October 4, 2004, Father filed an amendment to his petition for custody to request that he be designated as the primary residential parent for the child. He alleged that, since the November 15, 2001 order granting him equal parenting time, Malondria had benefitted from spending additional residential time with him. He alleged that Mother had been uncooperative in parenting, and that she acted irresponsibly in addressing the child's problems. In addition, he argued, Mother lived in an unstable family unit, because Stepfather and his son ("Stepbrother") had moved out of the family home. In contrast, Father asserted that he had a stable family unit, providing Malondria with a stepmother and three sisters at his home. He also alleged that Mother continued to use corporal punishment on Malondria, even though the child's therapist had explained to the parties the negative consequences of such measures. For these reasons, Father alleged that it was in Malondria's best interest for him to be designated as the primary residential parent.

In Mother's response, she asserted that Father regularly intimidated and threatened her. Mother maintained that she had tried to work with him, but said that he insisted that all arrangements be on his terms. Mother averred that Stepbrother had moved out of the home only because he reached majority, and that the problems in her relationship with Stepfather were the result of the stress surrounding the lack of any final resolution in this case. She denied that the equal-time parenting arrangement had benefitted Malondria and claimed that it was not in the best interest of the child to designate Father as the primary residential parent.

On October 21, 2004, the Juvenile Court, Judge Newell presiding, conducted a final hearing in the matter. Malondria, who was ten years old at the time, testified at the hearing. She stated that she had been alternating weeks between Mother's house and Father's house, and that she liked that arrangement. At Father's house, she lived with Father, her stepmother, her stepsister, and her twin half-sisters. At Mother's house, she said she lived with Mother and Stepfather. She said that Stepfather has a son, but that his son has not lived with them for a year. Malondria said that she

remembered the former arrangement, in which she spent every other weekend at Father's house. She testified that she preferred the arrangement of staying with each parent on alternating weeks. Malondria explained that, when she visited Father every other weekend, he would sometimes be away on the weekend, and she would miss him.

Father testified on his own behalf. He said that Malondria had been spending alternating weeks with him since the Juvenile Court's November 15, 2001 order. Since that time, Father said, his relationship with Malondria had been going well, much better than it was when he only visited with her on weekends. Father testified that he was very involved in Malondria's school and church activities, and noted that she did very well in school, having made all A's on her most recent report card.

Father testified that his wife, Rosemary ("Stepmother"), their twin five-year-old daughters, and Stepmother's daughter from a previous relationship all live in the home. He said that Malondria interacts well with all of them, and they enjoy a loving relationship. He acknowledged that Mother had taken Malondria to see a psychologist, John Ciocca, ("Dr. Ciocca"), for counseling. Father said that he speaks with Dr. Ciocca every two months or so to see whether there are any problems. He asserted that Mother had not participated in the sessions with Dr. Ciocca since January of 2004, and then had not participated for a year prior to that.

Father characterized the relationship between him and Mother in the past year as good. He stated, "We don't, per se, argue. I try to work things out, and she's compromising. And after years and years of problems . . . That's over with." Father said that he and Mother had not argued about Malondria since January 2004, and he felt that he and Mother could maintain good communications regarding the child. Father wanted to continue the alternating week visitation schedule and have joint decision-making authority with respect to Malondria.

On cross examination, counsel for Mother disputed Father's characterization of his relationship with Mother as good and cooperative, introducing into evidence correspondence between Mother and Father since the entry of the 1997 order granting Mother primary custody of the child. Father acknowledged letters written by him to Mother that accused Mother of subjecting the child to abuse in her household, of disrupting Malondria's school activities, and of being an evil, contrary, stubborn, perverse, and totally uncooperative person. In 2003, Father told Mother that she was not willing to understand the need for Father to be in Malondria's life. Father was asked about his second amended petition, in which he alleged that Mother acted irresponsibly and refused to cooperate regarding parenting issues. He acknowledged his allegation that Stepfather had been a very hostile co-parent of the child. Father testified that the primary caretaker of the child should be the parent who is more cooperative, and he felt that he was more cooperative than Mother.

Father acknowledged his prior allegations about Mother, and allowed that, although things were going better between he and Mother, they still were not "great." Father maintained that his relationship with Mother had improved over the years, and noted that, in December 2003, the parties

had entered into a mediation agreement to cease hostility.[3]  He observed that he, along with Mother and Malondria, met with Dr. Ciocca as a family and reconciled their past hostilities.

Father testified that one of the reasons he petitioned for a change in custody was the psychological problems that the child suffered while primarily in Mother's care.  He indicated that his belief about these alleged problems was based on the opinion of Dr. Ciocca, who had begun seeing Malondria in 2002.  Father admitted, however, that the crux of his petition is that he has been very involved in Malondria's life, and that he wanted to continue that level of involvement.

Dr. Ciocca testified as well.  He stated that Mother first brought Malondria to see him in February 2002, after the alternating weeks visitation schedule had been ordered and implemented, and that he had been seeing her ever since.  Mother was concerned about Malondria's ability to adapt to that schedule.  Dr. Ciocca said that, although Malondria had difficulty with the arrangement in the beginning, reporting anxiety and stomach problems, she made adjustments and improved.  Dr. Ciocca said that, by the end of the school year, around May 2002, Malondria was doing fine.

Dr. Ciocca described Malondria's behavior and adjustment to school over the two years prior to the hearing as reasonably good.  He said that Malondria was adaptable and reasonably able to be flexible with respect to changes in the parties' parenting arrangements.  When asked whether Malondria had ever expressed a preference with regard to her visitation arrangements, Dr. Ciocca said that, although she had a difficult time adjusting at first, she had not recently made negative comments about the alternating weeks schedule.

Dr. Ciocca said that Stepmother did not participate in any of the sessions with the child, though she was welcome.  He noted that Mother was sometimes accompanied by Stepfather in her visits.  He said that Stepfather had a good relationship with Malondria, and it appeared that he was very concerned about her welfare.

Dr. Ciocca stated that over the six months prior to the hearing, his contact with Malondria had been rather limited.  Because things had been stable during that time, he saw Malondria only once every two months, although he was available on an as-needed basis.  Dr. Ciocca did not necessarily see the alternating weeks arrangement as psychologically harmful, but clarified that he was not in a position to make specific recommendations about what was in Malondria's best interest or about the relative fitness of the parents.  He recommended that, if the Juvenile Court were to change the residential arrangement back to the original one, where Malondria visited Father every other weekend, such a change should be made gradually.  Dr. Ciocca acknowledged that there was some underlying hostility between the parties, but he thought that they had learned to set it aside for the benefit of the child.

---

[3]The mediation related to a confrontation that arose when Mother and Stepfather approached and confronted Father near the building where Mother worked.  Father testified that he filed a complaint against Mother and Stepfather, and that they filed a counterclaim against him.  This was resolved by mediation which resulted in the agreement to cease further hostilities between the parties.

Mother also testified at hearing. She said that in November 1997, when the Juvenile Court granted Father alternate week visitation, she maintained that custody was changed without any type of hearing and without allowing her an opportunity to testify. She admitted that she sent letters to Juvenile Court thereafter complaining about Father and accusing him of manipulating the system to his benefit. Mother said that she wanted to be designated the primary residential parent of Malondria so that the child would have a stable environment and consistency in her daily life. Mother acknowledged that Malondria had been able to adjust to the alternating weeks arrangement and that her education had not been adversely affected by it. She nevertheless insisted that Malondria needed to have one primary residence for the sake of stability and consistency.

Mother testified that Stepfather lived with her in her home. She admitted, however, that the stress from the custody case had caused problems in her relationship with Stepfather, and that he had moved out to live with his sister for a period of time. Though Mother told Malondria that Stepfather was living with his sister, she did not tell Malondria that they had been experiencing problems. Mother said that Stepfather has a strong, loving relationship with Malondria, and that he maintained that relationship even when he was not living in her home.

Mother acknowledged that she and Father had met in an attempt to resolve past hostilities, as Dr. Ciocca had testified. Since that time, however, Father resumed arguing with her and harassing her. She testified that Father had enrolled Malondria in summer camp without telling Mother, simply informing her afterward that she was responsible for paying for the camp during the weeks in which Malondria was with her. When Mother complained to Father that he had not consulted her about the camp, Father "started cussing, and told me that I need to make sure that I paid for that week that I had her because I get child support from him." The parties also disagreed about who should provide the child's school uniforms. Mother bought Malondria four uniforms to use during the weeks in which Malondria was with her, but she did not want the child to bring those uniforms to Father's house. Mother believed that Father should buy the uniforms worn during the weeks in which Malondria was with him; Father felt that Mother should purchase all of the uniforms with the child support she received from him. The parties also disagreed about who should pay for childcare before and after school. Again, apparently because he paid child support, Father wanted Mother to pay for all such care, including during the weeks in which Malondria was residing with him. Mother, on the other hand, was of the opinion that Father should pay for all Malondria's needs while Malondria was with him.

Counsel for Father questioned Mother about when she had stopped attending counseling sessions with Dr. Ciocca, noting that she had not attended counseling any time in 2004. Mother explained that she and Stepfather had not been to see Dr. Ciocca because Stepfather, Father, and she had entered into mediation with him around December 2003, and that they believed that they had all resolved their differences at that time. She said that "[w]e apologized for everything," and "everything was going okay with Malondria." Therefore, although she had not seen Dr. Ciocca, she planned to seek counseling from him in the future if any problems occurred with Malondria.

Mother admitted that she had not taken Malondria for counseling with Dr. Ciocca since January 2004. She was also unaware of the number of times Father had taken her. Mother emphasized that she was the one who took Malondria to see Dr. Ciocca initially, to help her adapt to the change in the custody arrangement in November 1997, and she said that she would be willing to take Malondria again if problems arise. Mother said that, for Malondria's sake, she was willing to communicate and cooperate with Father, but that it was frustrating to deal with Father because he is demanding, controlling, and manipulative. She testified that "every time I suggest something, he demands he's going to do it his way or no way at all . . . . I would love to work with him, and I have always wanted to work with him, but it gets hard. . . . [H]e subpoenas me to Court every month." Contrary to Father's testimony, Mother said, the parties did not get along well, stating that "If we got along we would not be here today."

Mother testified that Father had physically abused her in 1996, and that since then he has been verbally abusive towards her. She said that he often screamed at her over the telephone and called her "ugly, horrible names" when they did not agree on child-related matters. She said that these phone calls continued up to the date of hearing. Mother also said she received numerous objectionable letters from Father, as many as two or three letters a week, and that she eventually asked that all communications be done through counsel. Mother recounted that Father told her that he would "fight [her] to the end for joint custody," and that he would make her "pay every nickel of [her] child support on attorney fees."

Mother testified that Malondria attends church with her on a regular basis, and that Father sometimes drops her off there. She said that she has been Malondria's girl scout leader for the prior two to three years, a commitment that required her participation on a weekly basis. Mother said that she and Stepfather also regularly attended Malondria's gymnastics and school events. Mother enrolled Malondria in cheerleading and Saturday Scholar, apparently a school program, but asserted that Father refused to take her to those activities. Mother said that she encouraged Malondria's relationship with Father, and that she has bought gifts for Malondria to give him on Father's day, Christmas, and Father's birthday.

Stepfather also testified. He said that he and Mother were married in 2000 but they divorced in August 2004, a few months before the hearing. Though he was living with his sister, he continued to stay with Mother at times because he was still active in her life. Stepfather said that, prior to his marriage to Mother, Father called him to tell him what a horrible person Mother was and to accuse her of "all kinds of things." He stated that his divorce from Mother resulted from tension arising from this case and from his own health problems. Stepfather testified that he believed there was a strong possibility that he and Mother would reconcile, and said that they were "working through it."

Stepfather testified that he still considered himself to be Malondria's stepfather, even though he and Mother were divorced. He said that he continues to be around her on a regular basis, and that they attend church, go to the movies, and do other things together on the weekends. Stepfather asserted that Mother was an excellent example for Malondria, and is "by far, one of the best mothers

-8-

I've ever experienced or been around." He said that Mother puts Malondria "first and foremost" in her life.

Stepfather stated that he had been involved in Dr. Ciocca's counseling sessions with Malondria for about a year, along with Mother and Father. Stepfather said that Father, Mother, and he met with Dr. Ciocca, and that they all agreed to reconcile and put past animosities behind them. Despite this, he claimed, Father continued to threaten Mother and make false allegations against her. He testified that he heard Father curse, scream, and yell at Mother, but said that Mother did not yell back at Father. Stepfather claimed that, during some of the telephone calls, he intervened on Mother's behalf.

At the conclusion of the testimony, the guardian ad litem, Michelle Betsari (Betsari), told the Juvenile Court Judge that she had visited with Malondria, and while Malondria preferred spending equal time with both parents, she was adaptable and had a good support system to deal with any modifications made to her schedule. Betsari said that, since 1994, the parties had had some 35 court appearances, several every year. She encouraged the Juvenile Court Judge, in making his final ruling, to do what was necessary to end the "tug-of-war" between the parties.

At the conclusion of the hearing, the Juvenile Court Judge issued an oral ruling. He set aside the November 15, 2001 order providing for an alternating week schedule and denied Father's petition for a change of custody. The Juvenile Court found that there was no material change in circumstances warranting a change from Mother's designation as primary residential parent, and that designating Father as the primary residential parent was not in the child's best interest. The Juvenile Court Judge designated Mother as the primary residential parent of the child, and said that Father would have visitation according to a schedule set out by the Juvenile Court.

After hearing the testimony, the Juvenile Court Judge found that the parents were "at war," with each parent seeking to "dominate the other." He observed that "you've got to have a primary care giver," commenting, "I think that's why they say Juvenile Courts can't give joint custody." He stated, "I usually feel real comfortable [alternating weeks] in the early years, but I get a little uneasy about alternating weeks when the child gets around 10 or 12, because I feel like you need to stabilize this thing. . . ." He emphasized that the parties had "never really been able to sit down at McDonald's with your daughter there with you and really talk without really being at war." Numerous times, the Juvenile Court Judge alluded to the November 1997 order, apparently using the schedule in that order as a reference point. Despite this, when the parties were discussing the details of the visitation schedule and Father's counsel inquired directly, the Juvenile Court Judge's response was negative:

> Mr. Winchester: And before we go a little bit further down this [visitation schedule], Your Honor – you're keeping custody with the Mother. Is it because you – or just because you didn't find a material change of circumstances, or --
>
> The Court: I found two things. I really didn't find a material change of circumstances. Second, I didn't find it in the best interest of the child.
>
> Mr. Winchester: So if there's no material change of circumstances, wouldn't that

-9-

> necessarily get this [visitation schedule] back to the '97 order?
>
> The Court: No. Because I'm the Judge.
> Mr. Winchester: Okay.

The Juvenile Court Judge then explained to the parties his "standard" visitation schedule, invited input from the parties on the schedule, and stated, "I kind of looked over it, but it's pretty close to '97 [visitation schedule]." After the hearing, the Juvenile Court entered a written order consistent with its oral rulings.[4] From that order, Father now appeals.

On appeal, Father raises five issues: (1) whether Mother waived any right to a rehearing of the November 15, 2001 order by failing to file a timely petition for rehearing; (2) whether the Juvenile Court erred in conducting a rehearing of the November 15, 2001 order when a prior order of the court expressly denied a request for a rehearing; (3) whether the Juvenile Court denied Father's right to due process by erroneously determining that it was not permitted to award joint custody in a Juvenile Court proceeding; (4) whether the Juvenile Court abused its discretion in altering a prior custody order when it found that a material change in circumstances did not exist; and (5) whether the Juvenile Court erred in finding no material change in circumstances, and that continuing the alternating weeks arrangement set out in the November 15, 2001 order was not in the child's best interest. In contrast, Mother maintains that the Juvenile Court was correct in determining that a rehearing was necessary, and also in modifying the custody arrangement between the parties. She submits that the Juvenile Court actually did find a material change in circumstances, and found that designating Mother as the primary residential parent and setting out the new visitation schedule was in the best interest of the child.

The Juvenile Court's findings of fact are reviewed *de novo* on the record, presuming those findings to be correct unless the preponderance of the evidence is otherwise. ***Kendrick v. Shoemake***, 90 S.W.3d 566, 570 (Tenn. 2002); ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App. P. 13(d). The Juvenile Court's conclusions of law are reviewed *de novo*, with no such presumption of correctness. ***Kendrick***, 90 S.W.3d at 569–70.

Father's first two assignments of error challenge the Juvenile Court's decision to hold a rehearing on the November 15, 2001 order. Father claims that granting a rehearing was erroneous because Mother failed to file a petition for rehearing within five days of the decision, as required by local Juvenile Court Rule 13. Furthermore, Father argues, Juvenile Court Referee Woods entered an order in June 2002 specifically dismissing Mother's petition for rehearing. Thus, Father argues, conducting a rehearing was erroneous, and the November 15, 2001 order was final and should be given *res judicata* effect. If the alternating weeks schedule of visitation set out in the November 15, 2001 order is the operative, final order, then Mother would bear the burden of showing a change in

---

[4]In its order, the Juvenile Court stated that it was granting, rather than denying, Father's second amended petition for custody filed on October 12, 2004. In substance, however, the Juvenile Court denied the relief requested in the petition. Nothing in the record clarifies this apparent inconsistency. Based on the substance of the Juvenile Court's ruling and the terms of visitation set out therein, we find that Father's October 12, 2004 petition for custody was denied.

circumstances that would necessitate a change in custody back to her. If, on the other hand, the November 15, 2001 order was not a final order adjudicating custody, a change in circumstances must be measured from the November 1997 order granting Mother custody, requiring Father to prove a material change in circumstances that would necessitate a change in custody to him.

We begin our analysis by recognizing that, when a final decree is entered that adjudicates matters of custody, the decree is *res judicata* and will not be modified absent a change in circumstances that justifies such a modification for the welfare of the child. *Kendrick*, 90 S.W.3d at 570; *see also In re E.J.M.*, No. W2003-02603-COA-R3-JV, 2005 WL 562754, at *18 (Tenn. Ct. App. Mar. 10, 2005); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999). Though *temporary* custody orders may be entered after the entry of the final decree, a change in circumstances is measured from the *final* order of custody under which the parties are operating. *See In re E.J.M.*, 2005 WL 562754, at *18 (measuring a change in circumstances from the entry of the final decree of divorce); *Spatafore v. Spatafore*, No. E2001-02459-COA-R3-CV, 2002 WL 31728879, at *2 n.1 (Tenn. Ct. App. Dec. 5, 2002) (measuring a change in circumstances from entry of the final decree of divorce, despite existence of post-decree order changing custody temporarily); *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *5 (Tenn. Ct. App. July 21, 1999) (measuring a change in circumstances from "the entry of the presently operative custody decree").

To resolve this issue, we must consider the circumstances surrounding the Juvenile Court's entry of the November 15, 2001 order. Until Father filed his petition for a change in custody, the parties were operating under the November 1997 order, in which Mother was appointed the primary residential parent of Malondria and Father was given visitation every other weekend. On October 5, 2001, as modified on November 5, 2001, Father filed a petition for joint custody, but agreed that Mother should continue to be the primary custodian. On November 15, 2001, Juvenile Court Referee Woods conducted a hearing in which he heard argument from Father's attorney and from Mother, who was unrepresented by counsel. The record on appeal does not include a transcript of those proceedings. Nevertheless, it is undisputed that no sworn testimony or other evidence was presented to Referee Woods on that day. After hearing the parties' arguments, Referee Woods entered an order continuing the case *for a later hearing* and changing the parties' visitation schedule to allow Father visitation on alternating weeks "pending further orders of this Court."

There is no language in the November 15, 2001 order granting or denying Father's petition for a change in custody, nor is there an analysis of the existence of a material change in circumstances, the best interest of the child, or any other conclusion of law or fact. Furthermore, the language in the order itself states that the change in the visitation schedule was to be effective "pending further orders of this Court," and continues the matter for a hearing at a later date. This Court has recognized the difference between a temporary order, issued before a matter is fully adjudicated, and a final order entered after a full hearing:

> The law makes a distinction between temporary and final orders of custody. An interim order is one that adjudicates an issue preliminarily; while a final order fully

and completely defines the parties' rights with regard to the issue, leaving nothing else for the trial court to do. Trial Courts have discretion to grant temporary custody arrangements in circumstances where the trial court does not have sufficient information to make a permanent custody decision or where the health, safety, or welfare of the child or children are imperiled.

***Warren v. Warren***, No. W1999-02108-COA-R3-CV, 2001 WL 277965, at *4 (Tenn. Ct. App. Mar. 12, 2001) (citations and quotations omitted).

Under the circumstances of this case, we must conclude that the November 15, 2001 order was a temporary order pending a final hearing on the matter wherein the parties could present evidence to show a material change in circumstances, or a lack thereof, and the Juvenile Court could make a decision on Father's petition based on that evidence. Absent such evidence, a change in custody from the November 1997 order would have been clearly erroneous. Indeed, upon reflection, Referee Woods later recognized the temporary nature of his previous order at the April 8, 2004 hearing, after the transfer from Circuit Court and prior to his recusal in May 2004. At that hearing, he stated specifically that, "after reviewing [the November 15, 2001 order,] it was not a final determination . . . ." At times "temporary awards of custody often must be made quickly, without opportunity for full consideration of all of the circumstances." ***In re E.J.M.***, 2005 WL 562754, at *18. In the absence of a transcript of the November 15, 2001 hearing, we presume there was justification for such a temporary change in the visitation schedule. Nevertheless, though such a temporary order may be entered, a change in circumstances must still be measured from the final order adjudicating custody. Thus, although the November 15, 2001 order gave Father and Mother equal parenting time, the order was only temporary in nature pending a final hearing that was scheduled in the order itself. ***See Keisling v. Keisling***, M2003-02483-COA-R3-CV, 2005 WL 3193695, at *14 (Tenn. Ct. App. Nov. 29, 2005) (determining that, when more recent order did not constitute a final order adjudicating custody issues, first order adjudicating custody is the point from which a change in circumstances is measured); ***In re E.J.M.***, 2005 WL 562754, at *17-*18 (concluding that, although trial court changed custody temporarily during pendency of the father's petition for custody, the original order establishing the mother as the primary residential parent was the point from which a change in circumstances was measured).

Because the November 15, 2001 order was temporary in nature pending a final hearing, the July 23, 2004 hearing conducted by the Juvenile Court was not, in essence, a "rehearing" of the November 15, 2001 order, but was at long last the final hearing on Father's petition for a change of custody. In the November 15, 2001 order, the final hearing was scheduled for April 4, 2002, but the case entered a procedural morass when it was erroneously transferred to Circuit Court for final adjudication. By the time the case was transferred back to the Juvenile Court below, the November 15, 2001 order had been in effect for two and a half years, and there had still been no final hearing on Father's petition for custody. Thus, the Juvenile Court's July 23, 2004 hearing was not an erroneous "rehearing" of the November 15, 2001 order; rather, it was the final hearing for consideration of Father's petition for custody. Accordingly, we find no error in the Juvenile Court's decision to grant a full hearing.

Father also argues that the Juvenile Court abused its discretion in concluding that no material change in circumstances had occurred since the final order of custody, and that changing a joint custody arrangement would not be in the child's best interest. When a petition to change custody is filed, the parent seeking the change has the burden of showing that a material change in circumstances has occurred which makes a change in custody in the child's best interest. ***Blair v. Badenhope***, 77 S.W.3d 137, 148 (Tenn. 2002). Thus, the decision on a petition to modify custody involves a two-part test. As a "threshold issue," the trial court must determine whether there has been a material change in circumstances since the last custody determination. Although there are no bright-line rules for determining whether the requisite change in circumstances has occurred, relevant considerations are whether the change (1) has occurred after the entry of the last order sought to be modified; (2) was not reasonably anticipated when the last order was entered; and (3) is one that affects the child in a meaningful way. ***Cranston v. Combs***, 106 S.W.3d 641, 644 (Tenn. 2003); ***Kendrick***, 90 S.W.3d at 570; ***Blair***, 77 S.W.3d at 150. Under Tennessee Code Annotated § 36-6-101(a)(2)(B), when the issue before the Juvenile Court is the modification of the court's prior custody decree, a material change in circumstances "may include, but is not limited to, failures to adhere to the . . . order of custody and visitation or circumstances which make the parenting plan no longer in the best interest of the child."[5] T.C.A. § 36-6-101(a)(2)(B) (Supp. 2004). If a material change in circumstances has occurred, the Juvenile Court must then proceed to the second step in the analysis and determine whether the modification sought is in the child's best interest, in light of the factors enumerated in Tennessee Code Annotated § 36-6-106. Although evidence of substantial harm is relevant, a finding of substantial harm is not necessary to establish the requisite material change in circumstances. ***Cranston***, 106 S.W.3d at 645; ***see also*** T.C.A. § 36-6-101(a)(2)(B)–(C) (Supp. 2004).

In this case, the Juvenile Court determined that Father did not establish a material change in circumstances from the entry of the November 1997 order. Father argues that this conclusion was erroneous, because the evidence at trial showed that things had changed considerably from the date of the initial custody order. Father points out that, by the time of trial, Malondria had been residing with Father on alternating weeks for almost three years and had adjusted to that schedule. Malondria herself testified that she enjoyed that arrangement and preferred it over the every-other-weekend visitation schedule. Father also claims that the parties had resolved much of their hostility through

---

[5]The parties indicate in their briefs that the relevant subsection is 36-6-101(a)(2)(C), effective May 24, 2004, which applies when the issue before the court is the modification of a residential parenting schedule. That subsection provides:

> . . . A material change of circumstances for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

T.C.A. § 36-6-101(a)(2)(C) (Supp. 2004). Our analysis is the same regardless of whether we apply the description of a material change in circumstances set out in subsection (a)(2)(B) or (a)(2)(C). Under both provisions, the determination of whether a material change in circumstances exists is "not limited to" the circumstances set out in those provisions.

mediation with Dr. Ciocca, which was another change from their acrimonious relationship at the time of the November 1997 order. Father claims that Mother was not a credible witness, because she was dishonest in her trial testimony about her marital status, and she was dishonest with Malondria in not telling her the truth about her relationship with Stepfather. All this evidence, Father argues, preponderates against the Juvenile Court's finding that there had been no material change in circumstances since the November 1997 order.

Mother argues, however, that Father did not prove that a material change in circumstances had occurred since the November 1997 custody order, and notes that he did not even allege a change in circumstances in his original petition or in his amended petition for custody. Rather, Mother maintains, Father's initial petition was filed simply because he wanted more parenting time with Malondria, and points out that he admitted as much in his testimony. Mother insists that the parties' relationship is not harmonious, as portrayed by Father, but that the evidence showed that he continues to use threats, intimidation, and innuendo to control her, as he did at the time of the November 1997 order. Though Father may have established a stronger relationship with Malondria during the alternating weeks visitation schedule, Mother argues, "the development of a closer bond between a parent and a child is not typically deemed a material change in circumstances warranting a change of custody, because such a development is one that is hoped for in granting regular visitation, not an unexpected circumstance." *Blair*, 77 S.W.3d at 150 (quotation omitted).

Father raises valid arguments on this issue. Whatever the reason for the change in the visitation schedule to alternating weeks, it is undisputed that, although Malondria had difficulty with it initially, she eventually adjusted and lived with it for nearly three years. Moreover, she expressed clearly that she prefers such a schedule. This was corroborated by Dr. Ciocca in his testimony. On the other hand, there was considerable conflicting evidence on the relationship between the parents and their ability to work harmoniously in Malondria's interest. Father claimed that the parties had worked out their differences and were able to work together without significant incident. Mother's proof portrayed a significantly different picture, depicting Father as aggressive, verbally abusive and domineering, and indicating that neither party is able to work cooperatively on day-to-day issues such as Malondria's extracurricular activities or the responsibility for her school uniforms. The Juvenile Court Judge, who observed the witnesses and their demeanor, found that the parties were "at war" and unable to work together in the best interest of their child. On this basis, the Juvenile Court Judge found that there had been no material change in circumstances, that joint custody would be unworkable, and that Mother should remain the primary residential parent.

Resolution of the conflicting evidence on the harmony, or the lack thereof, in the parties' relationship depends on a determination of the witnesses' credibility. The trial judge, having observed the demeanor of the witnesses and heard their testimony, is in a far superior position to judge their credibility, and on appeal we give great deference to the trial court's determinations of credibility. *Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1977) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). In this case, the Juvenile Court Judge clearly credited the testimony of Mother and her witnesses on the acrimony in the parents' relationship, and we give great deference to this assessment. The Juvenile Court Judge found that

the contentiousness of the parties' relationship had not changed from the time of the November 15, 2001 order, and that this would make joint custody unworkable. Although there were positive effects from the schedule Father advocates, we cannot conclude that the Juvenile Court Judge erred in finding that there was not a material change in circumstances warranting changing the designation of Mother as primary residential parent.

In the alternative, Father argues that the Juvenile Court erred in modifying the November 1997 custody order in light of its conclusion that no material change in circumstances had occurred.[6] Again, in the alternative, Father contends that, because the Juvenile Court modified the November 1997 custody order, this must be because it found that a material change in circumstances existed, and therefore it erred in failing to engage in a best interest analysis. Mother argues that the Juvenile Court actually did find that a change in circumstances existed and modified the visitation agreement with the help of the parties.

The Juvenile Court clearly determined that there was no material change of circumstances warranting a change from the designation of Mother as primary residential parent, and also that it would not be in the best interest of the child to grant Father the joint custody arrangement that he requested. The visitation schedule set by the Juvenile Court below is similar, but not identical, to the arrangement set out in the November 1997 order. Because Father points to no way in which the new visitation schedule creates difficulty for him or significantly reduces his parenting time when compared to the November 1997 order, it appears that the primary thrust of Father's argument is that, if the Juvenile Court modified the visitation schedule at all, it must have found a material change in circumstances. This is not the case. We must conclude that the "tweaking" of the November 1997 visitation schedule by the Juvenile Court, with input from the parties, is not reversible error.

Finally, Father argues that the Juvenile Court denied his right to due process by erroneously determining that it was not permitted to award joint custody in a Juvenile Court proceeding. Father points out comments made by the Juvenile Court during the proceedings, such as, "I don't think I have the authority to give joint custody," and "I think that's why they say Juvenile Court's can't give joint custody. . . . I haven't considered joint custody in three or four years." Father contends that, because the Juvenile Court disregarded the relief sought by Father based on its erroneous interpretation of the law, he was denied a full, fair hearing on the issues in his petition for custody.

---

[6]Father also argues that our review of this issue is hampered by the Juvenile Court's continual changes in the limits of proof given to the parties in their examination of the witnesses. Indeed, at times during the hearing, the Juvenile Court limited the testimony to events that had occurred within the few years prior to trial. At other times, the Juvenile Court agreed to allow evidence of matters dating back to November 1997. The Juvenile Court explained that it would later determine which was the operative order stating, "Just put it all in there, and then I'll ask you people to do a brief and give me the . . . law, then I'll make a decision later on after the transcript." The Juvenile Court then later indicated that "we'll leave it up to [the] Appellate Court." Regardless, Father did not make an offer of proof on any testimony he sought to admit into evidence. Therefore, although the changes in the limits of proof caused confusion at trial, Father has not demonstrated that he was prejudiced by any such confusion.

As noted above, the Juvenile Court concluded that no material change in circumstances had occurred since the November 1997 order, and that therefore a change in the designation of the primary residential parent was not warranted. Moreover, the Juvenile Court found that the parties remained "at war," observing that they had been in court some thirty-five times over Malondria's custody. We have in the past emphasized that a "cooperative spirit" between the parties, or at least an ability to amicably resolve child-rearing disputes, is "essential to a joint custody arrangement." *Jahn v. Jahn*, 932 S.W.2d 939, 942 (Tenn. Ct. App. 1996). The chance that a joint custody arrangement will succeed "diminishes when the parents have turned child raising into a battleground." *Swett v. Swett*, No. M1998-00961-COA-R3-CV, 2002 WL 1389614, at *6 (Tenn. Ct. App. June 27, 2002). The Juvenile Court's conclusion that these parties lack a "cooperative spirit" is well supported in the record. Therefore, an award of joint custody would clearly be inappropriate under the circumstances, and any untoward comments by the Juvenile Court Judge would not amount to a deprivation of due process.

The decision of the Juvenile Court is affirmed. Costs on appeal are to be taxed to Appellant Mal Hooker and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

-16-